MARVIN, Judge,
dissenting:
I must respectfully disagree with the af-firmance by my able colleagues of this judgment and offer these dissenting reasons:
In this action filed by the State DHHR under LRS 14:403, the divorced mother appeals a judgment which terminated her parental-custodial right by adjudicating her two children in “need of care” because she inflicted “sexual abuse” upon one or both of them.[1] LRS 14:403; CJP Art. 13, (14)(a).
Even when we review the evidence most favorably in support of the State, as we should, I believe we must find the evidence legally insufficient. Accordingly, I suggest we should reverse and render judgment dismissing the State’s action. Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599, (1982); State in Interest of DEM, 441 So.2d 514 (La.App. 2d Cir.1983); See also State in Interest of A.E., 448 So.2d 183 (La.App. 4th Cir.1984); State in Interest of A.J., 465 So.2d 241 (La.App. 3d Cir.1985); State in Interest of Quitter, 424 So.2d 394 (La.App.2d Cir.1982). Under the particular allegations of this case, when the evidence is legally insufficient to prove that the children were sexually abused by, or through the neglect of, their mother, the juvenile court has no authority to render any judgment relating to the mother’s custody. See State in Interest of Purcell, 337 So.2d 637 (La.App.3d Cir.1976).
CONSTITUTIONAL STANDARD BURDEN OF PROOF
When the State undertakes to sever the parental-custodial right, a substantial and commanding interest of constitutional proportion is at stake. Santosky, supra; Lassiter v. Department of Social Services, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 *657 (1981). The State’s burden in such cases, notwithstanding CJP Art. 73 to the contrary, is more than the minimal preponderance of the evidence. Clear and convincing evidence is required to sever the parental bond. DEM, AE, AJ, Quilter, supra.[2]
On September 6,1985, in oral reasons for judgment, the trial court said
It’s a hearing ruled by ... the preponderance of the evidence ... The mother has been shown through a preponderance of the evidence to be the responsible party.
After the judgment was signed on September 10, 1985, and after noting the mother’s [correct] argument that the standard required clear and convincing evidence, the trial court, in written reasons for judgment on September 13, 1985, stated that the State had met that burden.
I shall attempt to review and summarize the evidence to demonstrate why we should respectfully conclude contrary to the trial court. I would reverse because the State has not shown by either a preponderance or by clear and convincing evidence what LRS 14:403 and CJP Art. 13(14)(a) require, that is that these are “children in need of care [because this] parent inflicted ... sexual abuse upon [one or both] the children
FACTS
The mother and father are medical doctors who were married for several years and who last lived together in Monroe where they were divorced in May 1984. The father was and is the coroner of Oua-chita Parish. In the joint custody decree the mother was awarded the primary custody of the children, a daughter RK, who was born February 21, 1980, and a son, KLW, who was born August 13,1981. The decree provided that the children were to visit with their father every other weekend, alternate holidays and birthdays, and for three two-week periods each summer. The father was paying $5,000 and then $4,000 per month for the support of his ex-wife and children. The father married for the second time shortly after the divorce and remained in Monroe. The mother moved with the children to Shreveport.
Apparently because of emotional trauma triggered by the break-up of her marriage, the mother began psychiatric therapy, which she has since continued, with a Shreveport psychiatrist (Dr. Seiden) after the divorce. In December 1984 the mother began taking the children for therapy with a Shreveport psychiatric social worker (Todd-Thompson) particularly because RK, the daughter, was having difficulty accepting the geographical separation of her parents and leaving her mother to visit her father in Monroe. This therapy continued from December 14,1984, until June 7,1985, when the children left for the first, and now, last, of their two-week visits with their father. This action was instituted on June 25, 1985.
The father testified he initially made inquiry to the Ouachita DA in early March about KLW’s use of sexually explicit words such as penis, vagina, and RW’s “stinking panties” in front of the father and stepmother. In April 1985 the mother took RW to her Shreveport pediatrician for treatment because RW was experiencing frequent voiding and a burning sensation when urinating.' The father acknowledged that the mother told him about RW’s urinary problem or her cystitis.
This record shows that many medical doctors teach their children the anatomically correct words for the genitalia. The mother stated that KLW had improperly used the words only on three occasions at home in Shreveport and was chastised the first two times and spanked the third time. *658 The children’s pediatricians in Monroe and in Shreveport, who had attended them periodically since birth, and others, lay and professional, testified that the children were not sexually explicit in their language and exhibited no sexual hangups. School authorities similarly testified.
On June 7, 1985, the children came to Monroe for their two-week visit with their father. According to his father, KLW again used sexually explicit words and inquired whether his father was going to marry his mother again. The father then consulted with a lawyer and hired private detectives to trail the mother and report on her activities on June 13, 14, and 15. On June 13 the father reported KLW’s words and conduct to a Monroe psychiatric social worker (Meriwether) who interviewed the children on that date. The narrative report of Meriwether’s initial interview of June 13 is innocuous and totally void of any improper reference to sexually explicit words or conduct by either child. Meriwether saw the children again on June 25, and several dates thereafter. Meriwether’s report is discussed further on p. 15 of this opinion.
On June 13 the father contacted the sheriff’s office. On June 19, two deputies conducted a “doll-play” interrogation of each child which was video-taped and transcribed in apparent compliance with LRS 15:440.1 et seq. I shall later illustrate what the trial court said was obvious about this interrogation.
On June 20 the children were taken by their father and DHHR employees to a Monroe pediatrician (Dr. Beauregard) for the specific purpose of examining them for any indication of sexual abuse. Dr. Beauregard testified that he could find no evidence of any abuse of KLW. He found RW’s vaginal opening to be 1 to 1.2 centimeters, an “equivocal” finding in his opinion.
Dr. Beauregard said he explained to the father
that this is an equivocal finding and the fact that the vaginal opening was this measurement, I could not make any definite statements about it ... I recommended [to the State DHHR and the father] that they see someone else to get another opinion.
Dr. Beauregard explained that he did not do a forensic examination, but made a “gross inspection” of the vaginal opening.
I did not see any evidence of any damage to the hymen. Again this is a variable thing in children and I could not see anything different from the hymen, you know, as compared to a lot of children.
When asked whether “there was any evidence that the hymen was not intact on [his] examination,” Dr. Beauregard answered, “Not on my examination.”
On July 22, RW, who was complaining of burning on urination, was examined by another Monroe pediatrician (O’Boyle) who had first examined both children on July 1 for possible sexual abuse at the request of the father and DHHR. In the July 22 examination Dr. O’Boyle found a healed tear “from 6 to 10 o-clock” in the hymen of RW. Dr. O’Boyle said the healed tear was
more than a week or two weeks old. I mean you heal from delivering a baby in six weeks, you know. So most of the time with healing in the vaginal area, within a week to 10 days they’re healed pretty well ...
Dr. O’Boyle could not “pinpoint” when the tear might have occurred, and did not attempt to testify who might have inflicted the healed tear she found on July 22.
Dr. O’Boyle agreed with Dr. Beauregard that a vaginal opening of 1-1.2 cm. in a child of RW’s age is equivocal and stated that she had seen a “great many” children with larger vaginal openings who had not been sexually abused. Dr. O’Boyle thought RW had been sexually abused but would not and did not say that the mother inflicted the abuse.
According to DHHR’s internal “Staffing Report,” written August 23, 1985, RW, throughout the investigation, “has verbally denied and stated that the allegations about her mother are not true and ... that her brother, KLW, is lying. When asked about the tear in her hymen, RW told Dr. O’Boyle that she did this herself.” Our *659 emphasis. The staffing report reviewed the written reports of the many experts who testified in the case about 10 days later. The report concluded:
It is not known who abused RW. It is possible that the mother could have done this and it is possible that the mother could have allowed someone else to do this.
Mr. Conrad [Family Service Worker] stated it is his opinion that if one of [the stepmother’s] sons abused her, RW would not be afraid to say so.
It is the decision of the staff that the recommendation be made to the court that the physical and legal custody of [the children] be given to the father ... The staffing was adjourned.
THE SHERIFF’S DOLL-PLAY INTERROGATION
A juvenile court may require that a statement of a child who has been sexually abused be recorded on videotape. LRS 15:440.2A(1). A coroner, in conjunction with the DA and hospital personnel, may require videotaping of children who have been sexually abused. LRS 15:440.2A(2). The videotape is not competent evidence, however, until the State proves “satisfactorily” that the interrogation of the child was not calculated to lead the child to make any particular statement. §§ 440.4A(3); 440.5A(4). Male and female dolls of children and adults and of animals were employed in some parts of the interrogation.
RW was interrogated for 33 minutes on June 19,1985, in the sheriff’s office. After naming visible parts of the body, RW was asked to name “other parts.” She declined, saying “it’s a bad word.” When told “it’s OK to me, you’re [with] a lady,” RW said “bagina” [sic] and said she did not know why it was a bad word.
“Have you ever seen a big person’s vagina?
“My real mother’s.
“What was momma doing when you saw it?
“... putting on her nightgown and panties ... at bedtime ...

“Have you ever touched her vagina?

“No.

“Has she ever touched yours?

“No.

“Have you ever seen one of these? ...

“My dad’s ... I think [he was] using the bathroom.
“Have you ever seen anybody else’s?
“Nobody but my brother’s ... a long time ago or a few weeks ago.
“... what was he doing?
“Getting in the bathtub maybe.
“... have you ever seen KLW’s penis when he wasn’t taking a bath?
“Just when he puts his nighties on * * *
“Do you ever play games without your clothes on?
“No ...
“With anybody?
“No.

“Dad said something about your playing some kind of game without your clothes on.

“I don’t do that.

“You’re sure?

“I’m sure. * * *

“Do you ever play any games without your clothes on with mommy?

“No ...

“You sure?

“I’m sure ...***

“KLW told me awhile ago that y’all played some kind of naked games. Is he telling me the truth?

“No, he is not.
“... can you tell me what he was talking about?
“No. He was telling a lie. * * *
“... maybe somebody told you not to tell us about these games. Is that right?
“No.

*660
“You’re not afraid of getting in trouble if you tell us ...

“No ...

“What about the time in the bathroom with you, momma, and KLW?

“No ... me, my momma, and KLW [were not] in bathroom together ... * * *
“Twinkie [a doll mouse used to ask the questions] says you’re afraid that your mommy will get in trouble if you tell us about these games?
“I am not.”
RW’s answers to the many professionals she saw later remained consistent, as the Staffing Report of DHHR noted.
The interrogation of the 3-year, 10-month-old KLW, conducted before that of RW, lasted one hour and 23 minutes on June 19, 1985. Transcribed, it totals 39 pages. KLW names the parts of each doll’s body that is shown him (vagina, penis, etc.).
“Who taught you all those parts ... ?
“I guessed it ... I just knew it (p. 5) * * *
“[what’s the difference] in the little girl doll and the mommy doll?
“... they’re bigger ...
“... what those are called?
“Nipples (p. 9)
“What kind of games do you like to play?
“Marbles ...
“[don’t like] monster games ... dragons
“any games ... you play [without] clothes ...?
“He-man
“How?
“You’re supposed to have a sword with you.
“Do you have your clothes on?
“Yes.

“All right, do you play any games where you don't have any clothes on at all though?

“No.

“Have you ever played those games?

“No.
“... I think I’ll have to go and find [you] some toys in a little bit. I’m curious about those games you played without any clothes on. Who taught you to play those games?
“I guessed them up too.

“Did anybody play with you?

“[RW].

“Who else?

“My dad ... my stepmother.

“Okay, and who else? Anybody else?

“No.

“Where?

“Home.
“What are those games called?
“I can’t remember.
“Where do you live ... I have a sister that lives in Shreveport ... She has a little boy about your age too. Do you ever play these kind of games with your momma?
“No.
“Does mommy ever play these games with anybody?
“... me and my sister ... (p. 11)
“... how is it played?
“... you touch them on the nose and you pick which nose ... you start crying because blood comes out when people squeeze the nose.
“... do you touch somewhere else?
“No.
“Are you sure?
“I’m sure.

“What other games do you play without your clothes on with your momma?

“Like superman ... you take one superman machine then it just starts going.
“Where is the superman machine on your body? ...
“It's right up on the eyes of superman ...
“How would I know how to play the game?
“I would start the machine for you ... you start on the yellow square ...
*661 [when playing] do I still have my clothes on ... or off ... ?
“You still have them on.
“When do I take my clothes off?
“Never, because you have to take your shoes off for that game ...
“Didn’t you tell me that you, your mom, and RW played a game where you didn’t have on any clothes? ... what’s [it] called?
“Pink panther ... I named it myself.
“... I could find some more toys or something for you to play with, but I’m really curious about this game. Who taught you?
“Nobody.
“When ... where ... who with ...?
“Wednesdays, Thursdays, and Saturdays ... [at the] Holiday Inn ... in Monroe ... [with] my stepmother, my dad, my sister and I.
“Before that, who ... with?
“Nobody.
“Do you ever play games with momma without ... clothes ... where she tickles you?
“No ... [we] play ... like Ticklebug ...
“Where does she tickle you?
“... tummy ... feet ...
“Does she ever tickle you right there?
“No.
“Did you ever tickle her right there?
“No.
“[other] games that you play that you don’t have any clothes on?
“No.
“What kind of game is that?
“Spiderman. (p. 16) * * *
“Okay, I’ll make you a deal, okay. You tell me about these games you play without any clothes on and I’ll go see if I can’t find you ... handcuffs ... you can play with if you want and also something that flies. How about that? ... Are you going to tell me about these games first?
“You start the machine and it goes real fast and then you roll the boat and the boat machine makes it go real fast ... [I got it] mainly from the grocery store.

“Is this the game you play with mommy without any clothes?

“Nods ‘no,’ then ‘yes.’
“... another game with mommy without ... clothes?
“No.
“Are you sure?
“I’m sure.
“You just want me to find something else [for you] to play with ... it’s all right to tell us about these games. You’re not going to get in any trouble, (p. 18) * * *
“[your] daddy was telling me about this game ... you lay with momma ... [without] clothes on ... can you tell me about that game?
“What game? ... I don’t know now ...

“You don’t know about the games that you and momma and RW played?

“No, but I’ll try to show something if this [paper airplane] can fly right ... you go like that [throwing airplane] ... and then it turned over and crashed.
“... I’ll show you the way I make an airplane ... Think it’ll fly? ...
“Now I’m going to try [to fly it]
“Does mommy have a name for the games ... y’all play [without] clothes ...?
“No ... (p. 21)

“Did you give it a name? ...

“Six Flags, yes [I made it up] ... (p. 22) * * *
“Twinkie [the doll mouse wants children to tell the truth] ...we need to know about these games ...
“I guessed it up and I know what it is. A helicopter.
“Okay, but if you can tell us about these games I bet Twinkie will find something ... for you to fly with, okay? Now can you tell us about those games?
*662 “... a superman game, a spiderman game
[[Image here]]
“You haven’t told us all about these games ... Does your mom ... touch when you don’t have ... clothes on?
“... right on my tummy.

“Twinkie told me ... she touches you between the legs ... Twinkie wants to know ... what does she do when she touches you between the legs?

“She spanks me ...

“[Twinkie] said show me on this doll how momma touches [you]

“She touches me between this part of the leg.

“No, that’s not what Twinkie was talking about ... What’s this called?

“Penis, (p. 25) * * *

“When did your mom put her mouth on your penis?

“I don’t know ...
“Where were you ... that’s what Twinkie wants to know?
“... at my Dad’s ... in Monroe.

“When mom put her mouth on your penis?

“What ?

“Do you remember that happening? Did it happen?

“No. I just dreamed about it ...
“Has momma ever put her mouth on your penis? Twinkie wants ... the truth.
“I didn’t ... She didn’t
“Twinkie wants to know why you told us she did ... has anybody told you you would get in trouble if you talked about that game?
“No. (p. 34)
“You do know the difference between the truth and a lie, don’t you?
“Yes. Now can you find me ... a toy? (p. 35)”
Other questions through p. 39 related only to Twinkie, airplanes, toys, and similar things until the interrogation ended. This videotape and transcribed interrogation is the only portion of this record that contains verbatim the questions put to the children and their answers. The remainder of the record concerning their later interrogation by others and their answers are narrative reports.
The videotape was admitted in evidence, over the objection of the mother’s attorney at R-468. At R-987 of the record, however, and on the third day of the trial, after experts had severely criticized the technique of the deputies, the court said:
Before we begin this morning, I’d like to make a statement for record purposes at this time ... In the Court’s deliberations during the pendency of this matter and after the conclusion of all the evidence in its deliberations to make a decision in this case, the Court will not be taking into account anything contained on the video tape of the two children made at the Ouachita Parish Sheriffs office. The Court is very strongly of the opinion that the tape is flawed. It’s flawed and the interview is flawed, flawed to the extent that in the Court’s opinion it should not be considered. The Court at the time had viewed the video tape with all counsel, I might add, had serious problems with the techniques used by the investigators, and I feel that any cursory review of the tape would show that to most anybody....
The trial court and the majority opinion rely heavily on the testimony of social worker Meriwether and of DHHR worker Futch. I append as an unpublished supplement A to this opinion the narrative report of Meriwether dated August 22, 1985. She saw the children first on June 13, 1985. The part of her narrative prefaced “information ... obtained in sessions with the children prior to the video tape session with the sheriff's deputies (p. 3),” I repeat, is totally innocuous and devoid of any improper reference to sexually explicit words or conduct by either child. That part of her narrative prefaced “information ... obtained ... after the deputies made the video taped interview (p. 5),” is the narrative *663 and not verbatim “evidence” on which the trial court and the majority opinion rely. Even this later part of the narrative is equivocal and far from clear and convincing:
... KLW first said no, then yes ... I asked who taught him to play that game. He said he taught himself, and on occasion said he guessed it up.... KLW denied that he had been involved in any sex play with his sister ... or other children ...
RW insisted that KLW was not telling the truth about what he did with mother ... she emphatically denied anyone had ever hurt her vagina or attempted to ... She admitted she had masturbated but said she never hurt herself ...
I told RW that grownups thought that someone might have put their fingers in her vagina and ... hurt her and that this was why everyone asked so many questions. RW said, “It didn’t happen.” ... She ... denied that she had ever played touching games with KLW [and] ... had never seen her mother and KLW touching each other’s genitalia.
In her “Summary,” Ms. Meriwether said:
KLW has contradicted himself in describing what took place ... RW emphatically denied her mother had involved herself sexually with either of them and that KLW indicated that his mother was angry with him when he attempted to touch her ... or roll on top of her. * * *
In the absence of any substantial evidence that this mother did indeed sexually molest these children, I would strongly recommend that the children be returned to ... their parents as soon as possible. [They] have been traumatized
[[Image here]]
According to my understanding of her narrative report, no evidence incriminating to the mother was derived from Ms. Meri-wether’s doll-play technique until after the tainted doll-play interrogation by the sheriff’s deputies.
Ms. Futch of DHHR saw the children on June 20, 1985, after the date of the sheriff’s interrogation. On June 25,1985, after viewing the sheriff’s videotape, Ms. Futch executed the affidavit to obtain the instanter order removing the children from the custody of their mother. We attach that affidavit as an unpublished Appendix B. This affidavit, in my opinion, is not supported by either the narrative reports or by the record. This affidavit put the juvenile machinery into motion that resulted in the judgment complained of. Ms. Futch’s affidavit cannot withstand veracity comparison either with the staffing report, and narratives upon which the staffing report is based, or especially with the record, in my opinion. Dr. Shewry, who read material to form his opinion, never talked to either of the children, but only to the father who hired him.
Other experts, for the father and for the mother, did not express the strong opinions that the staffing report suggests. The staffing report contains DHHR summaries of what the experts said in narrative reports, with some errors, of course, when compared to the testimony. The staffing report, in narrative form, is stronger and more favorable to the trial court’s result, however, than is the record testimony of the experts who were there cross-examined. But even the staffing report does not preponderate and is not clear and convincing evidence that this mother sexually abused either child or, through her neglect, allowed them to be sexually abused, even if sexual abuse, in the first place, be assumed.
It is not known who abused RW. It is possible that the mother could have done this [or] ... allowed someone else to do this.
A mother who is sexually abusing her children does not take them to a pediatrician for urinary problems, or to extended psychiatric therapy. This mother, by reputation and by direct observation of other medical professionals, neighbors, teachers, and psychological-psychiatric professionals, is not a pedophile or child molester. She is a competent and caring mother and medical doctor.
*664 Each case of this sort must rest on its own record and peculiar facts. Justice is not served by broad-brush statements that “society ... must decide [if] it is going to believe our children on the subject of sexual abuse [and] ... that children of this age simply do not lie about sexual abuse ...” Even if one wants to believe, as the trial court said, “that KLW was and is credible,” that finding, which is the trial court’s prerogative, does not achieve a preponderance, and especially not the clear and convincing, standard in the light of the testimony of others (the mother, RW, professionals and others who saw the children for months before June 7, 1985, the housekeepers and baby-sitters). Recent studies have shown that almost 65 percent of the claims of child sex abuse are “unfounded” or are proved to be unsubstantiated after “vigorous examination.” Besharov, “Doing Something” About Child Abuse: The Need to Narrow the Grounds for State Intervention, 8 Harvard Journal of Law and Public Policy 539, 566 (1985); Ren-shaw, When Sex Abuse is Falsely Charged, 19 Medical Aspects of Human Sexuality 116, 117 (1985). Author Besha-rov, first cited, is a former Director of the Center on Child Abuse.
OTHER MATTERS
The mother’s specifications of error deserve more attention from the majority, but need not be discussed in detail in a dissent, other than this comment on specification one, that the trial court erred in denying a change or transfer of venue to the parish of the child’s domicile.
The CJP prefers venue in child-in-need-of-care cases to be in, or to be transferred to, the parish of the child’s domicile. Art. 18. The trial court did not comply with Part C of that article by notifying the Caddo Juvenile Court of the action and allowing that court to request transfer.
CONCLUSION
Two weeks after RW came to Monroe from Schreveport, she was examined for signs of sexual abuse by a pediatrician of her father’s choice. “I did not see any evidence of any damage to the hymen ... I could not see anything different ... as compared to a lot of children.” There was no evidence [on June 20] that RW’s hymen was not intact.
Six and one-half weeks post-Shreveport, another pediatrician of her father’s choice found a partially (4/mhs) torn hymen, but healed without scabbing. “... [Y]ou heal from delivering a baby in six weeks ... so most of the time ... in the vaginal area, within a week to 10 days they’re healed pretty well.”
RW told at least two of her inquisitors that she did it to herself, consistently denying that her mother did it and asserting that KLW was lying, not telling the truth. Both pediatricians chosen by the father agreed that the size of the vaginal opening in RW was equivocal.
Even if I should agree arguendo that the State proved by clear and convincing evidence that RW was sexually abused by another, I cannot further conclude that the State proved by clear and convincing, or by preponderating, evidence, that the mother did it. While assuming sexual abuse, the Staffing Report, in seven words, summarizes the opinion evidence in the record and concludes: “It is not known who abused RW.”
The trial court’s judgment erred in concluding otherwise.
Repeatedly between June 19 and September 1, 1985, this four-year-old boy and five-year-old girl were questioned by a multitude of people, lay and professional. Psychiatrists thought they had been put through too much, or “conditioned.” This record before the videotaped interview contains almost nothing to support any allegation of sexual abuse. The record, after the videotaped interview, contains some but not preponderating evidence or clear and convincing evidence that KLW might have become preoccupied with human genitalia and how it might be employed by him and others. After the videotaped interview any *665 child, in my opinion, would have become so preoccupied.
If the State succeeds in casting this mother as the sexual abuser of her own children, she will be seriously and interminably stigmatized. She has already seen her parental-custodial rights usurped by the State. If the procedure, now started, continues to the logical extreme contemplated by the statutes, the parental bond, now temporarily broken, will be permanently broken. We are dealing with substantial, commanding interests of status, interests that are of constitutional proportions. I submit the trial court and the majority deals with these interests too lightly.
In a similar, but lesser-stigma case (mother’s neglect instead of sexual abuse), the trial court and the appellate court temporarily severed the mother’s parental-custodial right to her children. The facts and the rationale, upon which the supreme court reversed, are distinguishable. The observation of the supreme court, however, is pertinent:
When we closely examine the facts of this case and the procedures employed, it is apparent that the initiation of neglect proceedings by [the father] was hardly more than an attempt by him ... to use the ... juvenile neglect laws to wrest custody of his children from his wife. State in Interest of King, 310 So.2d 614, 617 (La.1975).
I respectfully dissent from the opinion affirming the trial court’s judgment.
Before HALL, MARVIN, FRED W. JONES, Jr., SEXTON and LINDSAY, JJ.

. On June 25, 1985, an instanter order under LRS 14:403 effectively divested the mother of court-ordered custody and granted temporary legal custody to DHHR and physical custody to the father.
On June 28, 1985, after a hearing, the juvenile court ordered legal custody continued with DHHR and granted temporary physical custody to the paternal grandparents and limited and supervised visitation to the parents.
On September 10, 1985, the court awarded physical and legal custody to the father and directed that DHHR exercise "courtesy supervision" for six months to coordinate visitation” with the mother and that the children remain in professional counseling for one year.

. LRS 14:403; 13:1601-1606, and the Code of Juvenile Procedure should be read together. The terms "abused child" and "abuse” in those statutes are defined in the same manner. Compare 14:403B(3) and 13:1600(1). Compare "child in need of care” in 13:1600(7) with CJP Art. 13(14).
Once a child is adjudicated in need of care because of sexual abuse, the parental right may be permanently severed by the State under LRS 13:1600 et seq.